26 U.S. 46 (____)
1 Pet. 46
GEORGE MINOR, PHILIP H. MINOR, DANIEL MINOR, WILLIAM MINOR AND SMITH MINOR, PLAINTIFFS IN ERROR,
vs.
THE MECHANICS BANK OF ALEXANDRIA, DEFENDANTS IN ERROR.
Supreme Court of United States.

*58 Mr. Taylor, and Mr. Jones, for the plaintiffs in error. &mdash.
Mr. Swann, and Mr. Wirt, Attorney General, for the defendants.
*62 Mr. Justice STORY delivered the opinion of the Court. 
This is a writ of error to the Circuit Court of the district of Columbia, sitting at Alexandria. The plaintiffs in error were original defendants in the cause, and the suit is now before this Court, upon the judgment of the Court below, upon certain pleas of the defendants, to which there was a demurrer; and also, upon the instructions given and refused by the Court, upon the trial of certain issues of fact, joined by the parties.
The action is debt upon an official bond, given by Philip. H. Minor, Cashier of the bank, and by four other persons, as his sureties, with condition, that Minor "shall well and truly execute the duties of Cashier" of the bank; and was originally brought against all the parties to the bond. The declaration proceeds for the penalty of the bond, without any notice of the condition, and avers, by way of breach, the non-payment of the penalty. The sureties, after oyer of the bond and condition, (which thereby became part of the declaration,) severed themselves from the principal, and pleaded nine several pleas. To the two first of these pleas, demurrers were put in, and the Court below, upon consideration, gave judgment upon the demurrers in favour of the bank; and the correctness of this decision, constitutes the first subject of inquiry.
Exceptions have been taken, both to the matter and the form of these pleas; and if the matter of them, or either of them, might constitute a good bar to the action, it may then be necessary to consider, whether that matter is pleaded with due propriety and certainty, according to the established rules of pleading, so as to escape objection upon general demurrer. Both of them are, in effect, though not in form, special pleas of nul teil corporation. The first plea, in substance, avers, that, by the charter granted by the Act of Congress, of the 16th of May 1812, ch. 87, the capital stock of the bank was by the charter fixed and limited, to consist of 500,000 dollars, bona fide;  that the whole capital stock was not bona fide filled up, and subscribed for; but, on the contrary, by a collusion between the commissioners, under whose direction the subscriptions were taken, and the subscribers, a large portion of the capital stock, to wit, 18,000 shares, amounting to 180,000 dollars, were filled up, by false and colourable subscriptions; the ostensible subscribers, after payment of the first instalments, were fraudulently permitted to withdraw the same; and future payments by them, were dipensed with, while they were still rated and held out, as stockholders, for the purpose of colourably *63 filling up the subscription of the whole capital stock, and electing a Board of Directors; and that, in this manner, and by these means, and by no other, the bank was put into operation.
This plea is meant to rest upon two grounds, to sustain its legal propriety. First, that the subscription of the whole capital stock of 500,000 dollars, was a condition precedent to the putting of the bank into operation as a corporation. Secondly, that the collusion between the commissioners and the subscribers, for the 18,000 shares, being fraudulent, made their subscriptions a mere nullity.
Various answers have been given at the bar, to the legal sufficiency of the matters thus pleaded. In the first place, it is said, that the defendants are estopped, by the bond, to deny the legal existence of the corporation. In the next place, that the charter does not make the subscription of the whole capital stock, a condition precedent to the establishment of the bank. In the next place, that the question, whether the bank was regularly, and bona fide, put into operation, is matter not inquirable into, in a suit of this nature, but only upon a quo warranto, instituted by the government; and, in the last place, that the whole stock being, in fact, subscribed, the fraudulent intention and acts of the parties, did not make the subscription of the 18,000 shares a nullity. Let us, then, consider what is the true construction of the charter itself, upon the points raised at the argument, supposing it to have been, (which in terms it is not,) incorporated into the plea, and therefore judicially before us. The first section of the Act of the 16th of May 1812, chap. 87, provides, "that the subscribers to the Mechanics Bank of Alexandria, their successors and assigns, shall be, and hereby are created, and made a body politic, by the name and style of the Mechanics Bank of Alexandria; and by such name and style, shall be, and are hereby made able and capable in law, to have, purchase, &c., lands, &c. &c., and the same to sell, &c, to sue and be sued, &c. &c.; subject to the rules, regulations, restrictions, limitations, and provisions, hereinafter prescribed and declared."
In this section, there is no limitation as to the number of the subscribers necessary to constitute the corporation. The subscribers, whether many or few, are declared to be incorporated; and, unless there be some restriction or limitation elsewhere in the Act, is most manifest, that the Court cannot intend that any particular amount of subscriptions is indispensable.
The second section provides, "that the capital stock of said corporation, may consist of 500,000 dollars, divided into shares of ten dollars each, and shall be paid in the following manner, *64 that is to say: one dollar on each share, at the time of subscribing, one dollar on each share at sixty days, and one dollar on each share, ninety days after the time of subscribing; the remainder to be called for, as the President and Directors may deem proper; provided they do not call for any payment in less than thirty days, nor for more than one dollar on each share, at any one time." The argument of the defendants is, that "may," in this section, means "must;" and reliance is placed upon a well known rule in the construction of public statutes, where, the word "may," is often construed as imperative. Without question, such a construction is proper, in all cases where the legislature mean to impose a positive and absolute duty, and not merely to give a discretionary power. But no general rule can be laid down upon this subject, further than that that exposition ought to be adopted in this, as in other cases, which carries into effect the true intent and object of the legislature in the enactment. The ordinary meaning of the language, must be presumed to be intended, unless it would manifestly defeat the object of the provisions. Now, we cannot say, that there is any leading object in this charter, which will be defeated by construing the word "may" in its common sense, as imparting a power to extend the capital stock to 500,000 dollars, and not an obligation, that it shall be that sum and none other. It is by no means clear, from this section, that the legislature contemplated that there should be a capital of 500,000 dollars, on which the bank was to commence, or carry on its operations. On the contrary, three instalments only are required to be absolutely paid in, and the residue of the capital stock is to be paid in, only when the President and Directors may deem it proper. So that the capital stock, except at the discretion of the Board, may never extend beyond the amount of 150,000 dollars, for any practical purposes, either as security to the public, or as the basis of discounts. Now, the plea itself does not attempt to deny that all but 18,000 shares of the stock were, bona fide, subscribed for; so that, for aught that appears, the capital stock, on which the bank carried on its operation, may have far exceeded that sum. It has been urged, that public policy requires such an imperative construction of the clause, for the public security. But it is a sufficient answer to that suggestion, that no such public policy is avowed, or can be inferred, from the general terms of the Act. When the legislature intends to restrict the capital stock of a bank, or to require any portion of stock or stockholders to be indispensable for its legal existence and operations, it is not uncommon to incorporate such a restriction into the charter. The omission to do so is quite as significant *65 that the legislature did not deem such a restriction subservient to any manifest public policy.
The legislature might well presume, after prescribing the maximum to which the capital stock should extend, that the actual capital to be employed might safely be left to the discretion of the stockholders, or its agents. The 13th section of the charter contains provisions for the security of the public against over issues by the bank, and if any such restriction had been intended, as the argument supposes, it would naturally have found a place. It declares, that no stockholder shall be answerable for any losses, deficiencies or failure of the capital stock, for any larger sum than the amount of the stock belonging to him; excepting, that if the total amount of the debt of the bank shall exceed twice the amount of its capital stock, over and above deposits, then the directors shall, in their private capacities, be liable for the excess; and if the directors shall not have property to pay the amount of the excess, then every stockholder shall be liable for their deficiencies, in proportion to their shares in the bank. Whether, therefore, the capital stock be great or small, if there be debts due from the bank, exceeding twice the amount of the capital stock; which may fairly be construed to mean the capital stock actually paid in; the stockholders become ultimately liable for the excess; and this liability furnishes, if not an ample, at least a reasonable security against the public evils, which the argument supposes might result from not requiring the whole capital to be subscribed for. At all events, we cannot perceive any clear legislative intention to make the subscription of the whole capital stock, a condition precedent to the corporate existence of the bank, and unless it is so made by the charter, the matter of the plea falls, and cannot sustain the defence.
I, however, this interpretation of the charter could not be supported, and the subscription of the whole capital stock were a condition precedent, the result, so far as the first plea goes, would not be varied. The fraud and collusion asserted in that plea, if admitted in its fullest manner, does not lead to the conclusion which it seeks to establish. If the subscription were fraudulently made, with a view to evade the provisions of the charter, the law will hold the parties bound by their subscriptions, and compellable to comply with all the terms and responsibilities imposed upon them, in the same manner, as if they were bona fide subscribers. It will not make the subscription itself a nullity, but it will deprive the subscribers of the power of availing themselves of the same. The third section of the Act manifestly contemplates cases of fraudulent subscription, and provides, "that all the subscriptions and shares obtained in consequence thereof, shall be, *66 deemed and held to be for the sole and exclusive use and benefit of the persons subscribing, or in whose behalf the subscriptions respectively shall be declared to be made, at the time of making the same; and all bargains, contracts, promises, agreements, and engagements, in any wise contravening this provision, shall be void; and the person, &c. subscribing, &c. shall have, enjoy, and receive the share or shares respectively, &c., and all the interest and emoluments thence arising, as freely, fully, and absolutely, as if they had severally and respectively paid the consideration therefor; any such bargain, &c. to the contrary notwithstanding."
This section seems to us conclusive upon the point. It avoids all bargains contravening the provisions in respect to subscriptions, and gives to the subscriptions the same effect as if they were bona fide made for the real use and benefit of the subscribers; and independently of this provision, it would be extremely difficult to maintain, upon general principles of law, that a private fraud, between the original subscribers and commissioners, could be permitted to be set up, to the injury of subsequent purchasers of the stock, who became bona fide holders, without any participation or notice of the fraud.
For these reasons, we are of opinion that the matter of the first plea, even if it had been well pleaded, would constitute no bar to the action.
The second plea is disposed of by the construction of the charter already intimated, and is further open to fatal objections, from its deficiency of proper averments, and want of legal certainty. It makes no averment of the amount of the capital stock, or of the necessity of the whole being subscribed for, before the bank is to be put in operation.
It asserts no fraudulent combination or subscription; but in the most general terms, without any certainty as to facts or circumstances, alleges, that the capital stock was not filled up by any subscription, opened and conducted in pursuance of the Act, so as to entitle the subscribers to bring the action; and that the subscribers did unjustly and unlawfully arrogate to themselves the corporate name, style, and privileges, without the capital stock having been filled up by subscription, or the corporation having been constituted and composed of actual subscribers, pursuant to the directions of the Act. In point of substance, as well as form, it is bad, upon the established rules of pleading.
This view of the case renders it wholly unnecessary to consider the point made as to the estoppal, and the necessity of a quo warranto; on which, therefore, we give no opinion.
The third and fourth pleas are intended to be pleas of general performance; the third is so, in fact, and pursues the condition *67 of the bond. The fourth is argumentative, and assumes a particular legal interpretation of the condition, that is to say, that the condition covers only wilful defaults, and breaches of duty, and is no security for competent skill and reasonable diligence in the discharge of duty, but only for honesty. To these pleas special replications were filed, assigning special breaches of duty, upon which the parties were at issue, and upon this, and all the other issues in the cause, the jury returned a verdict for the plaintiffs. No exception has been taken to the sufficiency of these replications.
The fifth plea states a general performance of duty, in obedience to and in pursuance of the "directions, rules, orders, usages and customs of trade and business, ordained, established and practised in the said bank, by the authority of the said President and Directors." It is, therefore, argumentative, and supposes that compliance with the rules, orders, usages, &c., established and practised by the President and Directors, whatever they may be, whether within the scope of their power or not, would be a good and true discharge of duty. To this plea, a general replication was put in, "that the said cause of action, in the declaration mentioned, did accrue, as in the said declaration and breaches are set forth, without this, that the matters set forth in the said plea, are true," and this the plaintiffs pray may be inquired of by the country; and the defendants joined in the issue; upon which a verdict was found in favour of the plaintiffs. An exception has been taken at the argument to this replication, upon the ground that it ought to have assigned a special breach, and that the omission is not cured by the verdict. There is no question that the replication is not drawn with technical accuracy and correctness; and if the plea be a good plea of general performance, it is clear, both upon principle and authority, that a special breach ought to have been assigned in the replication; and the objection, if insisted upon by way of demurrer, for that cause, would have been insuperable. The reason is, that the law requires every issue to be founded upon some certain point, that the parties may come prepared with their evidence, and not be taken by surprise, and the jury may not be misled by the introduction of various matters. A covenant or condition for general performance, is broken by any single omission of duty, and no inconvenience can arise from stating the particular breach with suitable certainty. But it does not follow, that if not so stated, the objection may be taken in any stage of the suit. The rule as to certainly in pleadings, is framed for the benefit of the parties, and may be waived by them, and in many cases, both at common law, and by the statute of jeo fales, defects in this particular are cured by a verdict. It is true, that in *68 a declaration upon a covenant for general performance of duty, if no breach be assigned, or a breach which is bad, as not being in point of law within the scope of the covenant, the defect is fatal, even after verdict. Com. Dig. Plead., p. 14. But that is not the present case. Here the declaration does assign a good breach, by the non-payment of the penal sum stated in the bond. The defendants disclose the condition of the bond upon oyer, and set up a general performance of it; and the replication, though inartificially drawn, puts in issue the whole matter of the defence, and denies the performance of it. The verdict has found that the condition was not performed, and consequently, upon the whole record, the non-payment of the penal sum is admitted, and the excuse for it is negatived. The replication, then, does assert a breach, though in too general a form. It ought to have assigned a special breach; but the general breach includes it, and the verdict having found the general breach, there is, upon principles, no reason shown against the plaintiff's right of recovery.
It is exactly like the case of a declaration upon a general covenant of the like nature, where a particular breach ought to be assigned; and yet if a general breach be assigned, the defect is cured, by a verdict for the plaintiff. Com. Dig. Plead., 48. The objection, then, to the replication to the fifth plea, cannot now be sustained.
It is not necessary to notice the remaining pleas, upon which issues were joined, because a verdict has been found in all of them in favour of the plaintiffs, however liable to objection some of them may be, and particularly the seventh plea of non damnificatus, as an answer to the declaration. They set up special defences, and the plaintiffs were not bound to do more than traverse them.
The instructions of the Court, given and refused at the trial, constitutes the next subject of inquiry. It is conceded, that if the instructions given on the prayer of the plaintiffs were correct, as to the issues on the third and fourth pleas, the qualifications annexed to them by the Court in their applications to the other issues, were perfectly proper.
The first instruction is, in substance, that if Minor, upon his leaving the bank, failed to pay over or to account to the bank for any portion of the moneys of the bank, received by him as Cashier; then the jury may, and ought to infer that the moneys so unaccounted for, were wilfully wasted by Minor, or applied to his own use; and under such circumstances, the defendants are liable for the same. We can perceive no error in this instruction; the presumption of a wilful waste or misapplication of the funds of the bank by the Cashier, was a natural conclusion, from his failure to pay over *69 or account for the same. It was not put to the jury as a presumption capable of being rebutted by evidence showing a loss by negligence or accident. If such a loss actually occurred, it was incumbent on the Cashier to prove it, and his total omission to offer any such proof, which, from the nature of the case, must be more within his own power, than that of the Bank, ought to lead the jury to the presumption of the non-existence of any such negligence, or accidental loss.
It has been argued, that this instruction is the more material and injurious to the defendants, because it proceeds in the latter part, upon a misconstruction of the true import of the condition of the bond. The condition, that Minor shall "well and truly execute the duties of Cashier" of the bank, is said to be merely a stipulation for honesty, in the discharge of the duties, and not for skill, capacity, or diligence. We are of a different opinion. "Well and truly to execute the duties of the office," includes not only honesty, but reasonable skill and diligence. If the duties are performed negligently and unskilfully  if they are violated, from want of capacity or want of care, they can never be said to be "well and truly executed." The operations of a bank, require diligence, with fitness and capacity, as well as honesty, in its Cashier; and the security for the faithful discharge of his duties, would be utterly illusory, if we were to narrow down its import, to a guarantee against personal fraud only.
The remarks already made, dispose of the second and third instructions prayed for by the plaintiffs. These instructions, in substance, declare that the sureties are liable upon the bond, for any wilful or permissive misapplication of the moneys of the bank, which the Cashier knowingly made, or suffered, without authority, whereby the same moneys have been lost to the bank. There seems no ground, upon which to rest any reasonable objection to such a direction to the jury.
We may now proceed to the consideration of the three instructions prayed for, in behalf of the defendants. The first is, in substance, that if it were the established usage and practice of the bank, that the Cashier might, in his discretion, permit customers to overdraw, and to have checks and notes charged up, without present funds in the bank; and for the Cashier to receive and pass, as cash, checks, and drafts upon other banks; and if the balances appearing against such persons charged in the books of the bank, arose out of the exercise of such discretion by the Cashier, in the course of the ordinary transactions of the bank, and pursuant to the established usage and course of business there adopted, and generally known to the President and Directors, practised and continued with their knowledge, for a series of years from the commencement of the bank, to the termination *70 of Minor's cashiership, though the existence of such balances, or the particular circumstances attending them, were not formally communicated to the Board of Directors; the jury may infer the approbation, assent, and acquiescence, of the President and Directors, as to such usage and course of business.
The refusal of this instruction, is matter of no small embarrassment and difficulty to this Court, from the terms in which it is couched, and the issues on the sixth, eighth, and ninth pleas, to which, alone, it can be properly applied. Those issues put to the jury the question, whether the acts of the Cashier, whatever might be their character or kind, were, or were not, done by the wrong, connivance and permission of the President and Directors of the Bank. The point of the instruction is, that the established usage and practice of the bank for a long period, known to the President and Directors, does afford a presumption of the approbation, assent, and acquiescence of the President and Directors, as to such usage and practice; though the balances resulting therefrom, were not formally communicated to the Directors. From the shape of the prayer, it is undoubtedly meant that such usage and practice was known to the President and Directors, as a board, and in their official character, and received their approbation as such. In a general view, with reference to the principles of the law of evidence, we are not prepared to admit, that such a presumption could not ordinarily arise. The ordinary usage and practice of a bank, in the absence of counter proof, must be supposed to result from the regulations prescribed by the Board of Directors; to whom, the charter and by-laws, submit the general management of the bank, and the control and direction of its officers. It would be not only inconvenient, but perilous, for the customers, or any other persons dealing with the bank, to transact their business with the officers upon any other presumption. The officers of the bank are held out to the public as having authority to act, according to the general usage, practice, and course of their business; and their acts within the scope of such usage, practice, and course of business, would, in general, bind the bank in favour of third persons possessing no other knowledge. In the case of the Bank of the United States vs. Dandridge, (12 Wheat. 64,) the subject was under the consideration of this Court; and circumstances far less cogent than the present to found a presumption of the official acts of the board, were yet deemed sufficient to justify their being laid before the jury, to raise such a presumption. If, therefore, the usage and practice alluded to, in the instruction, were within the legitimate authority of the board, and such as its written vote might justify, there would be no question, in this Court, that it ought to have been given.
*71 The pertinency of such a presumption, to these issues, cannot admit of dispute. But the real difficulty remains to be stated. Assuming that the Court, upon these issues, ought to have given the instruction prayed for, the question is whether upon the whole record, that is such an error as now justifies this Court in a reversal of the judgment. If the instruction had been given, and thereupon, a verdict upon these issues had been found for the defendants, could any judgment have been given upon these issues, in favour of the defendants; or ought the judgment, non obstante veredicto, to have been for the plaintiffs? If it ought, then the error becomes wholly immaterial; since, in no event, could the instruction, in point of law, have benefited the defendants. Upon deliberate consideration, we are of opinion, that the pleas, on which these issues are founded, are substantially bad. They set up a defence for the Cashier, that his omission "well and truly to perform" the duties of Cashier, was, by the wrong, connivance and permission of the Board of Directors. The question then comes to this, whether any act or vote of the Board of Directors, in violation of their own duties, and in fraud of the rights and interest of the stockholders of the bank, could amount to a justification of the Cashier, who was a particeps criminis.
We are of opinion, that it could not. However broad and general the powers of the direction may be, for the government and management of the concerns of the bank, by the general language of the charter and by-laws, those powers are not unlimited, but must receive a rational exposition. It cannot be pretended, that the board could, by a vote, authorize the Cashier to plunder the funds of the bank, or to cheat the stockholders of their interest therein. No vote could authorize the directors to divide among themselves, the capital stock, or justify the officers of the bank in an avowed embezzlement of its funds. The cases put are strong, but they demonstrate the principle only in a more forcible manner. Every act of fraud  every known departure from duty, by the board, in connivance with the Cashier, for the plain purpose of sacrificing the interest of the stockholders, though less reprehensible in morals, or less pernicious in its effects, than the cases supposed, would still be an excess of power, from its illegality  and, as such, void, as an authority to protect the Cashier, in his wrongful compliance. Now, the very form of these pleas, sets up the wrong and connivance of the board as a justification; and such wrong and connivance cannot, for a moment, be admitted as an excuse for the misapplication of the funds of the bank, by the Cashier.
The instruction prayed for, proceeds upon the same principles, as the pleas. It supposes, that the usage and practice of *72 the Cashier, under the sanction of the board, would justify a known misapplication of the funds of the bank. What is that usage and practice, as put in the case? It is a usage to allow customers to overdraw  and to have their checks and notes charged up, without present funds in the bank; stripped of all technical disguise  the usage and practice, thus attempted to be sanctioned, is a usage and practice to misapply the funds of the bank; and to connive at the withdrawal of the same, without any security, in favour of certain privileged persons. Such a usage and practice, is surely a manifest departure from the duty, both of the Directors and the Cashier, as cannot receive any countenance in a court of justice. It could not be supported by any vote of the directors, however formal; and, therefore, whenever done by the Cashier, is at his own peril, and upon the responsibility of himself and his sureties. It is any thing but "well and truly executing his duties, as Cashier." This view of the matter, disposes of this embarrassing point, and also of the second instruction prayed for, by the defendants; which substantially turns upon the like considerations.
The third instruction prayed for, in effect, was, that the Court would instruct the jury, that the defendants are not chargeable in this action for the conduct of Minor in the duties distinctly appertaining to the office of teller, whilst he was Cashier in the bank, although those duties were duly assigned to him; because it constituted a distinct office, and the accounts and proceedings of the teller, were at all times kept distinct, and in separate books, from those of the Cashier. In our judgment, this instruction was properly refused. By the fifth article of the second section of the by-laws of the bank, the duties of the Cashier are generally pointed out; and among other things, it is provided, that he shall "do and perform all other duties, that may from time be required of him by the President or Board of Directors, relative to the affairs of the institution." On the appointment of Minor as Cashier, who had previously acted as teller, the directors passed a vote, "that the present officers of the bank, do the whole duties of the bank." From the other circumstances of the case, the inference is irresistible, that the duties of teller were, under this vote, assigned to the Cashier. If so, then the performance of these duties constituted thenceforth a part of the duties of the Cashier, as such; and as much so, as if they had been originally affixed to the office of Cashier. There is nothing in the nature of the duties of teller, incompatible with those of Cashier; on the contrary, as is well known, Cashiers often perform the functions of both. The circumstance, that the office of teller, and distinct accounts, and books were still kept up, does *73 not vary the legal result. It was a matter of mere convenience and regularity, for the government of the bank, in its own business; and probably had no higher, or other origin, than to preserve the same forms and series of accounts, which the bank had adopted at its first institution. The office of teller had a nominal, but not a real, existence; and, from the time of the union of the duties in the Cashier, as such, there was a legal extinguishment of the separate official character. If the Cashier had originally had the duties of book-keeper and accountant assigned to him, and, in consequence thereof, had kept distinct account books in the bank, no one would have imagined, because he kept separate account books, as Cashier, for his own convenience, or, according to the ordinary usage of banks; that he would not, under his bond, have been responsible for mal-conduct, in keeping the general account books of the bank, to its loss or injury. The bond of the Cashier must be construed to cover all defaults in duty, which are annexed to the office from time to time, by those who are authorized to control the affairs of the bank; and sureties are presumed to enter into the contract, with reference to the rights and authorities of the President and Directors, under the charter and by-laws.
The remaining inquiry is, as to the effect of the nolle prosequi, which the plaintiffs entered against Minor, after he had pleaded, and after judgment was given against the sureties, in favour of the plaintiffs, upon all the pleadings interposed by the sureties. The pleas of Minor were, mutatis mutandis, the same as the third, fourth, fifth, seventh, and ninth pleas, put in by the sureties; and the question arises, whether under such circumstances, (no objection to the judgment appearing to have been made by the sureties,) this proceeding is an error, for which that judgment ought to be reversed. It is material to state, that the bond on which the suit is brought, is a joint and several bond. Under such circumstances, the plaintiff might have commenced suit against each of the obligors, severally, or a joint suit against them all. But in strictness of law, he has no right to commence a suit against any intermediate number. He must sue all or one. The objection, however, is not fatal to the merits, but is pleadable in abatement only; and if no so pleaded, it is waived by pleading to the merits. The reason is, that the obligation is still the deed of all the obligors who are sued, though not solely their deed; and therefore, there is no variance in point of law, between the deed declared on, and that proved. It is still the joint deed of the parties sued, although others have joined in it. This doctrine is laid down, and very clearly illustrated, in Mr. Serjeant Williams's note to the case of Cabell vs. Vaughan, (1 Saund. R. *74 291. Note 2,) where all the leading authorities are collected. If, therefore, the present suit had been brought against the four sureties only, and they had omitted to take the exception by a plea in abatement, the judgment in this case would have been unimpeachable. Is the legal predicament of the plaintiffs changed, by having sued all the parties, and subsequently, entered a nolle prosequi, against one of the obligors? If not in general, then, is there any legal difference, where the party in whose favour the nolle prosequi is entered, is not a surety, but a principal in the bond? not indeed, so named in the bond, but the suretyship resulting as a necessary inference from the nature and terms of the condition.
These questions must be decided by authority, if any such exist; if none can be found, then, they must be decided by analogy and principle. It may be proper, in this view, again to notice the fact, that this suit is on a joint and several bond; that the defendants severed in their pleas from the principal; that the trial of the issues, (which undoubtedly ought to have been, by the regular course of practice, deferred until the cause was at issue, as to all the parties, or the steps of the law taken to bring them into default;) does not appear upon the record to have been opposed, and that no motion was made in arrest of judgment, or for a postponement, until a trial of the issues upon the pleas of the principal might have been had. What would have been the proper proceedings under such circumstances, whether to try all the issues by the same jury, and have damages assessed at the same time against all the defendants; or whether there might have been several trials, and several assessment of damages; and whether, if such several assessments had been made, and differed in amount, any, and what judgment, ought to have been entered; are points upon which the Court does not think it necessary to give any opinion.
The nature and effect of a nolle prosequi, was not well defined, or understood, in early times; and the older authorities involve contradictory conclusions. In some cases it was considered in the nature of a retraxit, operating as a full release and discharge of the action, and, of course, as a bar to any future suit. In other cases it was held not to amount to a retraxit, but simply to an agreement not to proceed further in that suit, as to the particular person, or cause of action, to which it was applied. And this latter doctrine has been constantly adhered to, in modern times, and constitutes the received law. In cases of tort against several defendants, though they all join in the same plea, and are found jointly guilty, yet the plaintiff may, after verdict, enter a nolle prosequi, as to some of them, and take judgment against the rest. The reason is said to be, that the *75 action is in its nature joint and several; and, as the plaintiff might originally have commenced his suit against one only, and proceeded to judgment and execution against him alone, so he might, after verdict against several, elect to take his damages against either of them. A fortiori, the same doctrine applies where the defendants sever in their pleas. Indeed, in tort, as we shall hereafter see, it does not seem to have been denied, that cases might exist, in which, if the defendants severed in their pleas, the plaintiff might, after judgment against one, have entered a nolle prosequi as to the others. The doubt was, whether he could do so before judgment, which was finally settled in favour of the right, and in such cases, where several damages were assessed against the different defendants, the difficulty was afterwards cured, by entering a nolle prosequi as to all but one defendant. And in the same manner, a misjoinder of improper parties is sometimes aided. The authorities on this subject, will be found summed up with great accuracy, in a note of Mr. Serjeant Williams, to the case of Salmons vs. Smith, (1 Saund, R. 207, note 2.) In the same note, the learned editor adds, "if an action is brought upon any contract against several defendants, who join in their pleas, and a verdict is found against them, it is apprehended the plaintiff cannot enter a nolle prosequi against any of them; because the contract being joint, the plaintiff is compellable to bring his action against all the parties thereto; and he shall not, by entering a nolle prosequi, prevent the defendants against whom the recovery has been had, from calling upon the other defendants for a rateable contribution."
So far as this reason goes, it is inapplicable to the present case; for, the defendants are entitled not only to a rateable, but a full, contribution over, for the entire sum, against the party in whose favour the nolle prosequi has been entered; and consequently, the nolle prosequi does not touch their rights. It is observable also, that the language is qualified by the words "who join in their pleas;" which are printed in italics, and may therefore fairly be presumed to have been inserted by the learned editor, ex industria, with a view to point out an implied distinction between cases, where there is a severance, and where there is a joinder in the pleas. If there be any such distinction, it is favourable to the present case; for, the plaintiffs severed in their pleas from their principal. The learned editor proceeds to state, that, "if in such actions the defendants sever in their pleas, as where one pleads some plea which goes to his personal discharge, such as bankruptcy, ne unques executor, and the like, not to the action of the writ, the plaintiff may enter a nolle prosequi, as to him, and proceed against the others; for, with respect to the bankruptcy, the statute of 10th Ann, chap. 5, makes the *76 other defendant, who is not a bankrupt, liable for the whole debt; and therefore, in that particular instance the case is exactly the same, as where an action is joint and several. So the plea of ne unques executor, does not deny the cause of action; but only, that he is one of the representatives of the testator. When the defendants sever in their pleas, with this limitation as to the extent of the pleas in action upon contracts, it is immaterial, what is the form of the action; for, the plaintiff may enter a nolle prosequi against any of them, before verdict, and proceed against the rest."
The learned editor is fully borne out, in the general position here stated, by the case of Noke et al. vs. Ingraham, (Wilson R. 89,) to which he refers. The only question is, whether there is any such qualification upon it, as that the plea should be one going exclusively in personal discharge, and not to the merits? That is the point of real difficulty. The case in 1 Wilson R. 89, was upon several promises made by the defendants, as partners. One of them pleaded a former judgment; and issue being taken upon the replication of nul teil record, judgment was given against him, and a writ of inquiry of damages awarded, and final judgment. The other defendant pleaded his bankruptcy, and upon this, issue was joined; and afterwards the plaintiff entered a nolle prosequi, as to him. Upon error brought, the principal objection was, that the nolle prosequi, upon a joint contract of two, was a discharge of both. Mr. Chief Justice Lee said, "it is agreed, on all hands, that in trespass against several, the plaintiff may enter a nolle prosequi, as to one, and that will not discharge the other; and therefore, I cannot see, why it may not be done in this case; and I do not see, how so proper an advantage can be taken upon the statute of Ann, as to the bankrupt, as is now taken by the entry of this nolle prosequi." Wright, Justice, was of the same opinion, and so was Dennison, Justice; and the latter added, that "the plea of the bankrupt is not a plea to the action, but only a personal discharge; but that if one defendant was to plead a plea that was to go to the action of the writ, he thought it might then have a different consideration, but that this is not the case here. This case is exactly the same, as when an action is joint and several; for, the statute 10th Ann, ch. 15, has made the partner not a bankrupt, liable for the whole debt. This case is the very same, as to this matter of entering a nolle prosequi, as if it had been trespass against several defendants."
It is apparent, from this summary of the reasoning of the Court, that the case turned upon the consideration, that the contract, by the operation of the statute of Ann, was several as well as joint; and all the Court concurred, that, under such circumstances, the nolle prosequi would be good, being governed, *77 in the analogy, to trespass, where the cause of action was several as well as joint. What was stated by Dennison, Justice, was not the exclusive ground of his particular opinion, but only a suggestion, that the case might be, (not would be,) different upon a plea to the merits. Now, the general reasoning comes very close to the case at bar; for here the bond is several, as well as joint, and an action might have been maintained severally against the defendants; and what is not immaterial to be considered, all the parties were retained, who had joined in their pleas, and between whom there existed a right of mutual contribution. Even in the case of bankruptcy, the practice is, in England, to require all the joint contractors to be sued, as is proved by the case of Bevil vs. Wood, (2 Maul & Selw. 23,) which makes it really less strong than a joint and several contract.
The case of Moravia, and another, vs. Hunter & Glass, (2 Maul & Selw. 444), which has been relied on, at the bar, was assumpsit against four defendants, two of whom were not served; D., one of the other defendants, pleaded  1. Non assumpsit. 2. A special plea of bankruptcy. 3. A general plea of bankruptcy, as to whom the plaintiff entered a nolle prosequi. The other defendant pleaded non assumpsit, and a verdict was found against him. The form of the nolle prosequi was, that the plaintiffs, inasmuch as they "cannot deny the several matters above pleaded, by the said D., freely here in Court confess, that they will not further prosecute their suit against him." It was moved, in arrest of judgment, that the nolle prosequi, so entered, had confessed the non assumpsit, as well as the other pleas; and therefore, the other defendant was also discharged, and the distinction of Dennison, Jus., in Noke vs. Ingraham (1 Wils. R. 89,) was relied on. But the Court held, that the nolle prosequi was, in effect, only a confession; that as far as regards D., he had a defence in the matters pleaded by him. This case does not, in terms, overrule the distinction, but it does establish, that the Court upheld the nolle prosequi, notwithstanding the pleadings did set up a plea to the merits, and not merely a personal discharge. The contract does not appear to have been joint and several; and to have arrived at its conclusion, the Court must have considered, that the confession of the plaintiffs, that they could not deny the several matters above pleaded, ought not to be deemed an admission of the truth of the pleas, except so far as to waive further proceedings in the suit, against the party who sets them up as a defence. This conforms to the definition given in the book, of a nolle prosequi. "It is," as Serjeant Williams states, (1 Saund. R. 207, note 2,) "a partial forbearance by the plaintiff to proceed *78 any further, as to some of the defendants, or to part of the suit, but still he is at liberty to go on as to the rest."
These are the only cases in England, which the researches of counsel have brought to our notice, bearing directly on the point before the Court; and upon looking into the elementary treaties and books of practice, we have not been able to find any more general doctrine. Indeed, the latter confine themselves exclusively to the enunciation of the principles above stated, with the qualifications annexed to them in these authorities, as, see 1 Chitty's Plead., 32, 33. 546. Com. Dig. Pleader, X 2. 3. 5. 2 Tidd's Practice, 630. 2 Arch. Practice, 219, 220. 2 Lilly's Practical Register, 280. In America, the cases have gone a step further. In Hartness vs. Thompson, (5 John. R. 160,) where an action was brought against three, upon a joint and several promissory note, and there was a joint plea of non assumpsit, and the infancy of the defendants, that was set up at the trial; it was held no ground for a nonsuit; but the plaintiff upon a verdict found in his favour against the other two defendants, might enter a nolle prosequi, as to the infant, and take judgment upon the verdict against the others. In Woodward vs. Marshall, (1 Pickering's Reports, 500,) in the Supreme Court of Massachusetts, upon a joint contract and suit against two persons, one of whom pleaded infancy, it was held that a nolle prosequi might be entered, as to the infant, and the suit prosecuted against the other defendant. These decisions were admitted to be against the cases of Chandler vs. Parker, (3 Esp. Rep. 76,) and Jaffray vs. Frebain, (5 Esp. Rep. 47,) but the Court thought the practice adopted by themselves was most convenient, and therefore gave it a judicial sanction. These cases were distinguishable from that in 1 Wilson's R. 89, in the fact, that the plea went, not only in personal discharge, but proceeded upon a matter which established an original defect in the joint contract; whereas the plea of bankruptcy was for matter arising afterwards. The distinction was not thought to be sound. Indeed, the Court seem to have considered the question rather as a matter of practice, to be decided upon convenience and policy, than as matter of principle.
Hitherto the question has been discussed, as if the nolle prosequi had been entered before, when in fact it was entered after judgment against the defendants. The next inquiry is, whether this creates any substantial difference in the case. In Lever vs. Salkeld, (2 Salk. 455,) in trespass against two defendants, and verdict for the plaintiff, one being an infant, the plaintiff took judgment against the other, and entered a non pros. after upon the judgment; against the infants, and took out execution upon the judgment; upon error brought, it was objected that *79 a non pros. could not be entered after judgment, for the judgment could not vary from the demand of the writ. It was argued on the other side, that torts were several, and that a non pros might be entered after, as well as before judgment, and cases to this effect were cited. Lord Holt is reported to have said, that he supposed there were interlocutory judgments, wherein it might well be; but a final judgment differed, for that being once wrong, a subsequent entry would not set it right. The case was however adjourned, and nothing more appears of it. This case is not very accurately reported, and it may have been that the judgment was joint, and the nolle prosequi afterwards, which would remove the objection to its authority. The circumstances of its being adjourned, shows that the doctrine thrown out by Lord Holt, was not deliberately considered by him, and was deemed not clear. In truth, it is directly against the case of Parker vs. Lawrence, decided in the Exchequer chamber, and reported in Hobart's Rep. 70. That was trespass against three; one pleaded not guilty, and the other two a justification, to which the plaintiff replied, and there was a demurrer to the replication. Pending the demurrer, the issue was tried, and damages and judgment given against him. After judgment, the plaintiff entered a nolle prosequi against the other two, and a writ of error was afterwards brought by all three; and it was alleged for error, that the nolle prosequi discharged all three. It was agreed by the Court, (in conformity with the doctrine then prevailing,) that if the nolle prosequi had been before judgment, it would have discharged the whole action; and so it would, if the judgment had been against them all, and then the plaintiff had entered a nolle prosequi against the other two; for a nonsuit, or release, or other discharge of one, discharges the rest. But here the action was at an end, as to the one, by the judgment against him, and no judgment was had against the others, so that they were divided from him, and are not subject to the damages found against him. It was adjudged that he was not discharged, and there was no error. This case is of great authority, having been deliberately decided by a very high Court. It is cited as authority, by Chief Baron Comyns, in his digest, (Pleader, X. 5,) who also cites (Pleader, X. 3,) the case in Salkeld, as one in which there was a final judgment against all the defendants. The reasons of the thing would seem entirely in favour of the judgment in Hobart, and it stands supported by a much earlier case, in the year Books, (14 Edw. 4; Brooks abridg. Trespass, pl. 331.) If the plaintiff may, in any case, recover a judgment against one on a joint action against two, who sever in their pleadings, it is wholly immaterial to the regularity and effect of that judgment, in what stage of the cause the suit has ceased to be prosecuted *80 against the other. It is sufficient, that in the event the judgment is consistent with the general principles of the action. If a nolle prosequi may be entered after verdict, and before judgment, without discharging the other party, there is no good reason why it may not be done after judgment, when there has been no proceeding which binds the plaintiff to consummate a judgment against the party whom he wishes to dismiss. In each case the judgment upon the whole record is consistent with the writ.
The result of this examination into authorities, is, that there is no decision exactly in point, to the present case; that there is no distinction between entry of a nolle prosequi before, and the entry after judgment, applicable to the present facts. That the authorities, and particularly the American, proceed upon the ground that the question is matter of practice, to be decided upon considerations of policy and convenience, rather than matter of absolute principle; and that therefore this Court is left at full liberty to entertain such a decision as its own notions of general convenience, and legal analogies would lead it to adopt. We are of opinion, that where the defendants sever in their pleadings, a nolle prosequi ought to be allowed. It is a practice which violates no rules of pleading, and will generally subserve the public convenience. In the administration of justice, matter of form, not absolutely subjected to authority, may well yield to the substantial purposes of justice.
Mr. Justice JOHNSON, dissenting.
The facts appearing upon the records, from the court, pleas, and replications, are these. This action was on a bond given for the faithful discharge of the office of the Cashier, by Philip H. Minor. It was joint and several. The defendants craved over jointly, and pleaded performance, to which plaintiff replied.
They afterwards had leave to withdraw the joint pleas; and the four securities jointly filed various pleas, to which plaintiff replied; and issue being taken, proceeded to trial, and obtained this verdict.
After the verdict, the principal to the bond was ruled to plead, and he then files a variety of pleas, similar in effect, to those pleaded by the securities. The Court then gave judgment upon the verdict, and the plaintiff's attorney enters this nolle prosequi; and judgment is given for the principal, on the bond. That the plaintiffs take nothing by their bill, but for their false clamour, be in mercy, and that the defendant go thereof, without day, and receive his costs.
It was insisted by the defendants, that, in this state of the pleadings and record, the plaintiffs ought not to have had *81 judgment below  that there is error, and the judgment should be reversed. What further order this Court would be bound to render upon a reversal, it is not material to inquire. I readily assent to the doctrine, that, in adjudicating upon questions of practice, a Court should have regard to public convenience; but it would be extending this principle to the violation of its own spirit and intent, if carried to the extent of overturning known established rules, both of law and practice.
To this extent, it appears to me, the present decision goes; and that this judgment cannot be affirmed, without shaking as well established principles, as adjudged cases; and opening a door to inconveniences, which must soon compel this Court to retrace its steps.
The judgment, as it stands below, is against four out of five joint and several co-obligors; and the obligor omitted, or rather who has judgment in his favour, is the Cashier, for whose good conduct in office, the other three became bound. Now, this judgment is either a bar to a future suit against the principal, or it is not. If a bar, then the record exhibits the inconsistent case of four being made liable for one, who was not liable himself. And if it is not a bar, then, by possibility, it may be established by the verdict of a future jury, that the co-obligor, for whose misfeasance, alone, these defendants have had judgment against them, had, in fact, committed no misfeasance. A rule of practice, that may lead to such consequences, cannot rest upon public convenience.
Nor is it more easy to reconcile it to principle. No authority need be cited, to establish, that wherever, judgment ought to have been arrested below, this Court is bound to reverse for error. Now this judgment is against one of the canons of the law of contracts. It was at the option of the plaintiff, whether to treat the bond as a joint or several contract. He has elected to treat it as joint; and must, therefore, abide by the law of joint contracts, as to both right and remedy; and, upon these; when under seal, it is an invariable rule, that all must be sued, if all have sealed the instrument, and are in life.
It is true, that, in general, the non-joinder of co-obligors must be pleaded in abatement; but it would be oppressive and inconsistent to apply this rule to a case, in which it was impossible to plead in abatement, and that was precisely this case; since the discharge of the principal from the action, was produced by the act of the plaintiff, after judgment, at a time when it was impossible, by any form of pleadings, for the defendants to avail themselves of this right. But this case comes within an exception to the general rule on the subject of pleas in abatement; since, by the plaintiff's own showing, in his declaration *82 and replication, all the co-obligors named in the instrument, sealed it, and were in life at the commencement and close of the suit.
This distinction, if it be necessary to cite authority for it, clearly appears from comparing the case of Rice vs. Shultz, 5 Bur. Reports. 2611, with the case of Hermer and Moore, noticed in the report of the case. In the one, it was necessary to plead in abatement, because the facts did not appear on record, which were necessary to maintain the defence. In the other, the judgment was arrested, because the facts of the plaintiff's own showing, made out that he ought not to have judgment, which were, all had sealed the instrument  and all were alive. It cannot be questioned, that in a joint contract by five, where all remain equally bound  all in life, and all within reach of the process; more especially, where they have been all actually arrested, the plaintiff must recover against all, or none. This is that case; and yet the plaintiff is allowed here to take judgment against four, and discharge the fifth, the principal, by nolle prosequi, after judgment.
It cannot be doubted, that had this nolle prosequi been entered before trial, the defendants must have been permitted to plead it, puis darien continuance, and that the plea must have been sustained. And what reason is there, for placing them in a worse situation, by suffering the nolle prosequi to be entered after judgment? It is said they severed in pleading, and suffered the cause to go to trial, without objection. But was it in the power of these defendants, to compel their co-obligors to join them in pleading? or if the plaintiff choose to proceed erroneously to trial, were the defendants under any obligation to arrest him, and set him right? It was his own folly, if he ruled them to trial, or consented to go to trial, or committed any other error, in proceeding to judgment. I have stated it to be not indispensable, in my view of the subject, that the nolle prosequi should be a bar in this case to a new suit against the principal. The derangement of the rights and liabilities of the parties, produced by it, appears a sufficient objection both to the principle and practice. For, certainly, it goes to enable a plaintiff to recover, by this device, against parties, who otherwise could have defeated his action by suitably pleading. By a novel practice, as it relates to joint contracts, he is here permitted to evade an important legal principle. But, if this nolle prosequi can be shown to be a bar to his action against the principal co-obligor, it would seem to be incontestible, that this judgment ought to be reversed. And I am yet to learn, that, in a joint action in contract against several. a nolle prosequi as to the whole action, against one. is not a bar as to him.
*83 The cases are very few in the Books, in which the effects of a nolle prosequi, in such a case, has been tried by the only sufficient test  a plea in bar, to a suit upon the same contract. But as far as they have gone, they maintain the bar.
If a bar, in cases in which the suit is against a single defendant, there can be no reason assigned why it should not be a bar as against one of the several defendants. And to this point, Beecher's case, reported in 8 Coke, 58. Croke James, 211, is direct and positive.
That was a suit upon a bond, and the judgment there is nearly in the words of the judgment in this case. On a second action, upon the same contract, this was held to be a bar; and it became necessary to remove the judgments, by a writ of error, for some technical informalities, before this oblige could recover in the original contract.
It is true, that Serjeant Williams has said, in his note to 1 Saunders, (207 a.) "that a nolle prosequi is now held to be no bar to a future action, for the same cause, except in those cases where, from the nature of the action, judgment and execution against one, is a satisfaction of all the damages sustained by the plaintiff."
And by reference to the next page of his note, it appears, that the exception here introduced, is intended to embrace actions for torts; and therefore his rule is intended to apply to actions on contracts.
But the authorities he cites, are far from bearing him out in his doctrine. The case of Cooper vs. Tiffin, (3 T.R., 511,) upon which he relies, decides nothing but a question of costs; and the position, that a nolle prosequi is no more than a discontinuance, and the party may sue again, is only an obiter dictum, in case where the point was not presented.
So, also, of his other case, in 1 Will. 89. The facts did not raise the question on the effect of the nolle prosequi, as to the defendant who was discharged by it; and the Judges, in considering whether the plaintiff could have judgment against some of the joint contractors, where the other was discharged by bankruptcy, expressly decide upon the ground, that he being discharged by law, leaving the other bound for the debt, produced an analogy between that case and the case of a suit in trespass, where one only might be sued separately. But it is said, and so Serjeant Williams asserts, "that the true nature and extent of a nolle prosequi, in civil cases, was not accurately defined and ascertained, until modern times."
My own opinion is, from all the investigation I have been able to make, that it was much better understood, in former times, than it is at this day. That if it were now better understood we should perceive fewer of those inconsistencies which *84 are supposed to exist in the decisions on this subject. Thus Serjeant Williams has mixed up the cases on torts, with those on contracts, in such a manner as could only produce confusion. To sustain the doctrine that a nolle prosequi, in an action of debt, is a bar to another suit on the same bond, he quotes Green vs. Charnock, (Croke Eliz., 762,) which was trespass quare clausam fregit. And for other cases which he says establishes the principle "that a nolle prosequi is not of the nature of a retraxit, or a release; but an agreement only, not to proceed as to some of the defendants, on a part of the suit." Without restricting the doctrine to any class of cases, the cites a string of authorities, in every one of which the decisions were in actions of trespass, or tort.
Yet it cannot be contended that the use of the nolle prosequi in cases of tort, in which the defendants may be joined and disjoined at the pleasure of the plaintiff, can afford precedent or authority for the use of it, in cases of joint contract; in which the law, regarding the nature of the contract, and the rights of the parties, imposes on the plaintiff the obligation to sue them jointly.
To me it appears that there is abundant authority to prove that the nolle prosequi, though entered by attorney, with the judgment that defendant "eat sine die," has the effect of a retraxit. Lord Coke certainly places them on the same foot, both in his Institutes, (1 Inst. 139,) and his comment upon Beecher's case (8 Rep.,) and in both instances he describes the nolle prosequi as one of two kinds of retraxit, appropriate to different cases, but both producing a bar. And yet in one only is the term retraxit introduced into the entry of judgment. (See also 2 Rolls Abridg. nolle prosequi.)
In Green vs. Charnock, (Cro. Eliz. 762,) they are certainly treated as synonymous and equivalent. That was trespass, quare clausam fregit, against C. & S.S. made default and judgment of nil dicit was then taken against him. C. pleaded in bar, plaintiff replied, &c. and judgment in demurrers for plaintiff. A nolle prosequi was then entered against S. and writ of inquiry and judgment against C. And the case proceeds; "thereupon they brought error, and the error assigned, was because this nolle prosequi is against one, when judgment is taken against both; being that a retraxit against one is as strong as a release against the one, the which being to one defendant, is a good discharge to both." So again, in the case of Dennis vs. Payne, Cro., ch. 551, P. & P. gave their joint and several bond to D. who sued the one severally, and after plea, entered a retraxit. He afterwards brought suit upon the bond, against the other, P. who plead the retraxit to the first in bar. There was no question made upon its being a bar, either direct *85 or by estoppal; as to the obligor first sued, it is, in terms, admitted. But the benefit of that discharge was claimed by the second P. and on this the judges divided, one maintaining that its effect was that of a release, and the other, that of an estoppal, only to be taken advantage of by him, in whose favour it was entered; and Croke, who held it to be an estoppal, identifies it with a nolle prosequi, by observing that it is "quasi an agreement that he will no further prosecute; "non vult, ulterius prosequi." So that both admit it to be a bar against the one discharged. So in Hobart, 70, and in 3 Kebble, 332, p. 81, in the year 1674; nolle prosequi and retraxit are considered as synonymous. So in Silley's Practical Register, in 1719, a nolle prosequi is defined thus: "this is, that the plaintiff will proceed no further in his action, and may be as well before as after verdict; and is stronger against the plaintiff than a nonsuit, for a nonsuit is a default for non-appearance, but this is a voluntary acknowledgment that he hath no cause of action." (Title Nolle Pros.)
So Serjeant Salkeld, who comes down to the time of Queen Ann, refers to Beecher's case for the law of retraxit, and gives the definition of retraxit in the words of the entry of a nolle prosequi, (Title Retraxit, 3 Salk.) So in 4 Wood, 87, in the year 1691, it is distinctly asserted, that an entry "of a venit hic in curia, et fatitur hic in curia, with a judgment that defendant eat under sine die" is equivalent to a retraxit. At what period a different idea begun to prevail, I have not been able to discover; certainly I can find no adjudged case to support it.
In the case of Walsh vs. Bishop, in Cro. Char. 239, 243, referred to by Serjeant Williams, as introducing a different doctrine, is directly against him. That was an action of trespass and battery against two; they severed in pleading, and after verdict against both, a nolle prosequi was entered against one, and the other moved it in arrest of judgment. In that case, it is admitted, in terms, by the Court, that as to the one, the nolle prosequi was an absolute bar. And by reference to the same case, in page 239, it will be seen, that the argument rested upon the right of a plaintiff to proceed against one of several defendants in trespass.
If this plaintiff ever had a right to proceed against these four defendants, in originating this suit, I should have felt no doubt. That is the case in trespass, that is the case where one defendant is bankrupt, or an infant, or pleads ne unques executor. 1 Will. 89. 3 Espin. R. 76. There is a modern book of practice of great respectability, (I mean Sellon, title, Nolle Prosequi,) in which this doctrine is summed up to my entire satisfaction. The form of the entry is there given in words, and conforms entirely to the entry in this case, except that the words are here added, that "the plaintiffs take nothing by their *86 bill, but for their `false clamours be in mercy;'" which can at least detract nothing from the effects of the judgment. Yet it is there laid down, as the law of his day, that such a judgment, when it goes to the whole cause of action, operates in effect, as a retraxit. The judgment in this case goes to the whole cause of action, and as between the plaintiff and the Cashier, is of the same effect, as if there had been no other defendant to the action. In a subsequent part of the article, the same author, (Sellon,) recognises the distinction between cases of trespass, or tort, and cases of contract; and lays down the rights of the parties in each, in accordance with the view I entertain on the subject, to wit: that if the nolle prosequi be entered, so as to produce any derangement in the rights of the defendant, to deprive them of a legal defence, or subject them to increased difficulties or liabilities, it is error.
The case in Maul & Selwyn, which was supposed to have overruled the previous decisions, is in perfect accordance with them; for, although the defendant had pleaded non assumpsit, he had also pleaded his discharge as a bankrupt. On the contrary, if the language of the Court in that case be considered as affording the true rationale of the entry of the nolle prosequi, it would be fatal to the plaintiffs in this cause. The Court say, it amounts to an acknowledgment that the one defendant had a defence. But what defence did this co-obligor set up that the other defendants ought to have the benefit of? His pleas, were, in terms, those which had been pleaded by these co-obligors. If this confession of plaintiffs went to those pleas, then were these defendants discharged, since they could not be liable if he was not guilty.
It is a question of no importance  one of no influence upon the law of the case, whether a nolle prosequi may be entered before, or after judgment, or when it may be entered; otherwise than as it affects the legal relations of the parties, and the rules which govern suits at law.
And here, I think, I may very confidently maintain, that in no case can a nolle prosequi be legally entered, as to one of the defendants, unless the suit might originally have been maintained against those who remain; or, unless the remaining defendants might have availed themselves of pleading the non-joinder of their co-obligor, if their rights were affected by his exclusion from the action.
In the first class are comprised all actions of tort, in which no prejudice is done to the defendants, since their co-defendant need not originally have been made a party. And I may add also, the case of bankrupts and infants, both of whom, when joint contractors, may be admitted as defendants, upon declaring against their co-obligors, according to the truth of the *87 case. They may, also, without prejudice to their co-defendants, be discharged by nolle prosequi; but even as to them, it seems, the precedents imposed a restriction; for, it is not permitted, if they have blended their fate with that of their co-defendants, by joining in their pleas. They have then waived their privilege. If their pleas impart no waiver of their privilege, the right of the plaintiff to his nolle prosequi, as to them, is conceded; because the relations of the parties are not altered, nor their rights in any way prejudiced. But I conceive the nolle prosequi cannot be entered at any point of time, when it would place the defendants in a worse situation, or deprive them of any advantage of making their defence.
Surely the precedents for entering the nolle prosequi after judgment in actions of trespass, against some defendants, and going on to levy satisfaction from the rest, can afford no precedent here; since it is, in the one case, what the law enjoins; in the other, what it forbids.
Nor are the precedents of cases in which the one defendant never was bound, or is discharged by operation of law, without discharging the other, any better authority. In all these cases, the relative rights and liabilities of the parties remain the same. No legal absurdities can ensue, and no more is given against them, by the judgment, than what could have been legally claimed of them by the action.
There is one curious result produced by this decision, which is not among the least of the objections to rendering a judgment for the defendant in error. It cannot be contested, and the whole argument is admitted, that if the discharge of the principal produce a bar in his favour, this judgment should be reversed for error. But the conclusion, that it is no bar, is now to be deduced from a string of decisions, in every one of which, Serjeant Williams himself admits, that no recovery could be had against the defendant who has been discharged by the nolle prosequi. It is true, he attributes this bar to the nature of the action; but this is at least acknowledging that the material question, in the trespass cases, never could arise in the present case. In the only case, however, even in trespass, in which the question in this case came distinctly before the Court, I mean the case of Green vs. Charnock, (1 Croke, 762;) in which there was an interlocutory judgment against S., and judgment pronounced against C., and a nolle prosequi as to S.; it was adjudged, that the nolle prosequi as to S. was a release to him, and therefore to C.; and the judgment against C., was reversed in error brought, and yet there they did not join in pleading. If, in the present case, the defendants had all pleaded, whether jointly or severally, and verdict had been for the one defendant, on any plea to the merits, it is clear, that, not *88 withstanding a verdict had passed for the plaintiff against the remaining four, he could not have had judgment, (1 Saund. 217.) And the distinction between the actions of debt and trespass on this point, has been, until now, considered as known and established, (1 Plow. 66. 6. 8 Rep. 120. 133. 2 Lilly.Ab. 210. 107.) Upon the whole, I am very clear, that this judgment ought to be reversed, and judgment below entered for defendants.
Judgment affirmed, with costs.